SAMUEL A. McGREGOR AND WILLIAM P. McGREGOR v. THE ERIE RAILWAY COMPANY.

1. The status of the Erie Railway Company, from Paterson to the Hudson river, is as follows: For about one and a half miles from Paterson it uses the franchises of the Paterson and Ramapo Railroad Company, and for the residue of the distance it uses the franchises of the Paterson and Hudson Railroad Company down to the depot at Jersey City.

2. The Erie Railway Company must be considered as running on the Long Dock Railroad under the Paterson and Hudson River charter and rates. They cannot charge as common carriers.

3. The additional charge of four cents per one hundred pounds (for terminal expenses) on freights destined for Jersey City or New York, and upon all freights from Jersey City or New York, is unlawful; having been paid involuntarily and under protest, it may be recovered back by the parties paying.

4. In ordinary cases between individuals, where a person has no power to enforce an unjust claim but by legal remedies, and another pays it, he cannot recover it. Both parties are on an equal footing. But when they are not on an equal footing and money is paid not by compulsion of law, but by compulsion of circumstances—as when it is paid to release goods from illegal restraint, which cannot otherwise be reasonably effected, or to compel the performance of a duty by others in order to enjoy or obtain a right—it may be recovered back. Under this head may be classed moneys paid under color of title or charges on turnpikes and railroads.

5. Where a corporation or person has the power to refuse a right to which a party is entitled, unless he complies with an unjust demand, the parties do not stand upon an equal footing.

6. Courts will not be illiberal in allowing a person to act upon his reasonable apprehension of such refusal, where the circumstances fairly show that unless he does submit to the demand, his right will be withheld.

In *assumpsit.*    On rule to show cause why verdict should not be set aside.

The suit is brought by the plaintiffs to recover back of the defendants, certain moneys alleged to have been unlawfully demanded and taken by them from the plaintiffs for the transportation of goods, wares and merchandise on their road from Paterson to the Hudson river.

The declaration sets forth in substance, that the defendants, on the 10th of November, 1869, at Paterson, &c., were and still are an incorporated company, authorized by law to operate a certain railroad in this state, extending from Paterson to Jersey City, at a place called Pavonia, or Long Dock, and take toll or charge for the transportation of passengers, goods, wares, and merchandise thereon; that said road is composed of the railroads of the Paterson and Hudson River Railroad Company, of the Long Dock Company, and a portion of the railroad of the Paterson and Ramapo Railroad Company; that the said last mentioned railroads are corporations of this state; and the plaintiffs aver that the Hudson River Railroad Company, by their charter, are authorized to charge no more than at the rate of six cents per mile per ton for the transportation of goods, &c., on their said road; and that the Paterson and Ramapo Railroad Company were authorized to charge no more than at the rate of ten cents per mile per ton for the transportation of goods, &c., on their railroad.

And the plaintiffs further state, &c., that a depot for the receiving and delivery of passengers and freight has been established and is now used in the city of Paterson, and another depot for the same purpose has been established and is now used on the west bank of the Hudson river, in Jersey City, at Pavonia, or Long Dock; and that the distance between said depots by said railroad is fifteen miles and one-half of a mile; of which distance one-half of a mile of said railroad, including the said depot at Paterson, is part of the railroad of the Paterson and Ramapo Railroad Company, and

two and a half miles of said railroad, including the said depot at Long Dock, constitutes the railroad of the Long Dock Company; and the residue of said road, being twelve and one-half miles, is part of the road of the Paterson and Hudson River Railroad Company.

And the plaintiffs further aver, &c., that the said Erie Railway Company possesses and operates the said railroads respectively, under certain leases and contracts made by said companies respectively, and can lawfully make only such and so great changes for the transportation of goods, &c., on said railroads as the said last-named companies were authorized to make by their respective charters, or at the most and in any case, no more than five cents per hundred pounds, or $1 per ton for the whole distance for the transportation, &c., between the aforesaid depots.

And the plaintiffs further aver, that between the 10th day of November, 1869, and the time of commencing this suit, the said Erie Railway Company, then operating and running the said railroad between the city of Paterson and Jersey City, in the counties, &c., did demand and take of and from the said plaintiffs the sum of $10,120, for the transportation of one thousand tons of freight and merchandise of the said plaintiff's, on and over the said railroad from the aforesaid depot of said railroad, in the city of Paterson, to the aforesaid depot of said railroad in the city of Jersey City; and for the transportation of one thousand tons of other freight, &c., of the said plaintiffs, from the aforesaid depot of the said railroad in the city of Jersey City, to the aforesaid depot of the said railroad in the city of Paterson, the same being the sum of six cents per ton greater and in excess of the charges authorized by law; and did demand and take from said plaintiffs the further sum of $2000 for terminal expenses or charges for the transportation of the said two thousand tons of merchandise as aforesaid; which last demanding and taking was wholly unlawful, and made for such transportation under a mere pretence of terminal expenses, but for the real purpose of indirectly increasing the charge for the transportation of

said goods, &c., of said plaintiffs, and the same was then and there made without any authority of law; and so the plaintiffs aver that the said defendants did, directly and indirectly, take and demand for the transportation of said goods, &c., in manner aforesaid, the aggregate sum of $4120; the said sum thus demanded being more than the rate of charge allowed by law for that purpose, whereby the said defendants became liable to pay to the said plaintiffs the sum of six cents per ton for overcharge upon each and every ton of freight by them so transported on said road for the said plaintiffs, and the further sum of $1 per ton for terminal expenses, so as aforesaid unlawfully demanded and taken from the said plaintiffs, and amounting in the aggregate to the sum of $2000; and being so liable, they, the said defendants, in consideration thereof, afterwards, to wit, on the 14th day of February, 1870, to wit, at Paterson, &c., did then and there faithfully promise the said plaintiffs well and truly to pay to them the said sum of money last above named, when they, the said defendants, should be thereto afterwards requested.

To this were added the common counts. The defendants pleaded the general issue.

On the trial of the issue in the Circuit Court of the county of Passaic, at the September Term, 1870, a verdict was rendered for the plaintiffs for $800, and thereupon on application of the defendants, it was ordered that the plaintiffs show cause at the February Term of the Supreme Court, why the verdict should not be set aside and a new trial granted.

Various reasons were assigned for setting aside the verdict, of which the principal were—

That the judge, at the Circuit, permitted the plaintiffs to offer in evidence a deed from the Society of Useful Manufactures, of the city of Paterson, to the president and directors of the Paterson and Hudson River Railroad, and a deed from said society to the said president and directors of the Hudson River Railroad Company.

That the judge overruled the offer of the defendants to prove that the merchandise transported for the plaintiffs by

the defendants was express matter, within the meaning of the act entitled "An act relative to freights and fares on railroads," approved April 11th, 1867.

That the merchandise in the bill of particulars set forth, transported by defendants for plaintiffs, consisted of small packages, the property of different owners, so that the defendants were entitled to the benefit of the act entitled "An act relative to freights and transit duties on railroads," approved March 24th, 1862, and the supplement thereto.

That the judge refused to non-suit the plaintiffs, and charged the jury that the plaintiffs were entitled to a verdict against the defendants of $800, on their own showing.

The rule was argued before BEASLEY, CHIEF JUSTICE, and Justices BEDLE and DEPUE.

For the rule, *I. W. Scudder*, *Leon Abbett*, and *J. B. Vredenburgh.*

Contra, *S. Tuttle* and *T. D. Hoxsey.*

BEDLE, J. This suit is brought to recover back alleged overcharges made by the Erie Railway Company for the transportation of merchandise for the plaintiffs, between Paterson and Jersey City. The goods were delivered to the company at their freight depots in Paterson and Jersey City, and transported over the company's line between those points. The rest of the transportation, from Jersey City to New York, was done by the plaintiffs with their own wagons. The company had been accustomed to charge the plaintiffs at the rate of $1.06 per ton for freight between Paterson and Jersey City, up to November 10th, 1869, at which time a further demand was made of five cents for each hundred pounds, for terminal expenses. This demand was made by the agents of the company under an order issued by the company to them, dated November 2d, 1869, as follows:

"To STATION AGENTS:

"On and after the 10th instant, you will, in addition to the regular tariff rate, make an additional charge of five cents per one hundred pounds (for terminal expenses) on all freight destined for Jersey City or New York. This must appear upon your way-bills as a separate item. The same charge will be made upon all freights from Jersey City or New. York. This applies to all stations, whether on the main and branches on the Hudson Railroad, the Northern Railroad of New Jersey, and Paterson Branch and Union Railroad."

The company collected these additional amounts from November 10th, 1869, the plaintiffs alleging that the same were paid under protest. The plaintiffs, in their declaration, claimed that the whole of the terminal charges were illegal, and also that the rate of $1.06 per ton was too much by six cents. This latter claim was abandoned, as the same was voluntarily paid, yet the inquiry in this cause will necessarily cover the whole question of rates that the company may charge between *Paterson and Jersey City*. The claim for five cents a ton additional, as terminal, appears in all the bills presented to the plaintiffs as a separate item.

The first question will be as to the rates the company can charge for transportation between Paterson and Jersey City. This involves an examination into the status of the Erie Railway Company in New Jersey, and the charters under which their line is operated between the points named, and also an examination of some acts applicable to railroads generally.

The defendants operate a continuous line of railroad between Paterson and the Hudson river, the whole distance of which is about sixteen miles, disregarding the fractions. Of this line about one-half a mile (being in the city of Paterson) is a part of the Paterson and Ramapo road, built under a charter of March 10th, 1841, (*Laws of* 1841, *p.* 97,) and another part of the line, being about twelve and a half miles,

McGregor v. Erie Railway Co.

was built by the Paterson and Hudson River Railroad Company, under a charter of January 21st, 1831, (*Harr. Laws* 218,) and extends from the Paterson and Ramapo Railroad, in Paterson, to near the westerly side of the Bergen tunnel. The remaining part of the line was built by the Long Dock Company, under a charter of February 26th, 1856, (*Laws of* 1856, *p.* 67,) and runs from the end of the Paterson and Hudson road through the tunnel, to the termination of the route, the distance being a little over two and a half miles.

The case shows that the Paterson and Ramapo and the Paterson and Hudson River roads are now held and operated by the Erie Railway Company, under certain leases originally made to the Union Railroad Company, which were assigned to the New York and Erie Railroad Company, and which, by certain judicial proceedings against that company, by foreclosure and sale, with the aid of certain legislation in this state, (*Acts of March 22d*, 1860, *and March 13th*, 1862,) became vested in the Erie Railway Company, so that such company is now the lessee of said roads, and possessed of all their franchises. These leases have been fully legalized and confirmed by two several acts, one passed March 14th, 1853, (*Laws of* 1853, *p.* 480,) the other, March 13th, 1862, (*Laws of* 1862, *p.* 207.) The Erie Railway Company has therefore full legislative authority to exercise the franchises of those two companies, and is subject to the provisions and limitations of their charters and supplements. The case does not develop the precise relation of the defendants to the Long Dock Company. The fact, however, appears that the Long Dock Company built the road through the tunnel, and to the ferry, and that the same is operated by the Erie Railway Company as a part of their line from Paterson. It is a matter of some regret that this omission appears in the case, but neither side offered to show that relation on the trial, and the case must therefore be determined under this uncertainty.

It is claimed by the defendants that the Long Dock Company was only authorized to construct their railroad, without being empowered to use it as carriers, and that the same was

to be merely a public highway for others, and that the Erie company, as a foreign corporation, were operating that part of their continuous line merely as common carriers, without any legislative authority or limitation, and could charge any rates that were reasonable for transportation over that part of the route.

The Erie company has full possession of the Long Dock road, and is apparently using every franchise necessary to its operation. This, of course, is subject to such rights as any other companies may have to its use as a public highway. The powers under which the defendants run the Long Dock road must arise in one of three ways :

*First.* As a foreign corporation, carrying on simply a carrying business within our state, and exercising only the common law right of carriers ; or,

*Secondly.* As lessees of the Long Dock Company, exercising its franchises ; or,

*Thirdly.* As lessees of the Paterson and Hudson road, and using the Long Dock road as a public highway.

Each of these views must be examined, and the first is as to the claim of the company as common carriers merely.

The business of a common carrier is general, and has its foundation in the common law, needing in itself no legislative authority. It is not a franchise, and I have no doubt that, by the comity of states, a foreign corporation may exercise in this state a carrier business merely, and may, for that purpose, like any other citizen of the state, use its highways, whether they be ordinary public roads, turnpikes, or railroads. The use merely of these highways is of common right ; they are intended for the accommodation of the public, and although they are created by the exercise of the prerogative power, yet the use of them is of common right. The mode of use, however, by the public, is different on a railroad from that on a common highway or turnpike. On these the public have a common right to travel by foot or in their vehicles, or in all the ordinary modes of travel on such highways ; but on a railroad it is not so. A railroad, although a

public highway, is such *sub modo;* it is not adapted to the ordinary modes of travel. The public have a common right to use its conveniences, but such use must be according to the mode in which railroads are operated. The building and running of a railroad for public use are of public right, and require legislative sanction. The right to construct a turnpike for public use is also a franchise, but of a simpler nature. The building of it *merely,* exhausts its scope, except as to tolls, and subject thereto the public use of it, according to the ordinary modes of travel. It is not a necessary part of governmental duty to provide vehicles for transportation upon it. The franchises necessary to construct a railroad are greater. From the very nature of that mode of travel, they must consist of the road itself and the running of it. The public have no common right to operate a railroad. The construction of the road as a material thing affords no accommodation to the public; and in order to complete it as a highway in which the public may be entitled to a common use, it is necessary that the state should authorize it to be operated. A railroad is not a high way that the public should be permitted to use in their own way, or to put on locomotives and trains at their pleasure, unless the legislature has authorized it. The right to run the road is as much a part of the franchise as the right to build it. The building of a road and the running of it may be granted to separate hands, yet in each it is a function of government. In the case of *The Rar. & Del. Bay R. R. Co.* v. *The Del. & Rar. Canal and Camden & Amboy R. R. & Trans. Co.,* 3 *C. E. Green* 546, the Chief Justice says: "A railroad for public use is *publici juris.* It cannot be legally erected without a legislative permission." And in that case the making, possessing, and using a railroad were regarded as franchises. Justice Elmer, in his note (*Nix. Dig.* 796,) in referring to that case, says: "The right to carry passengers on a railway is a franchise requiring a specific grant from the legislature;" and in the case of *D., L. & W. R. R. Co* v. *The Erie Railway Co.,* 6 *C. E. Green* 286, the Chief Justice says: "That it was decided that the right to build and use a

railroad for the public use, is a franchise." This is clearly in accordance with the spirit of that case, and is according to the well understood necessities and course of legislation in this state. In the case of *The State* v. *Boston, C. & M. R. R. Co.*, 25 *Vt.* 433, the court says : " The right to build and run a railroad and take tolls or fares, is a franchise of a prerogative character, which no person can legally exercise without some special grant of the legislature." These references indicate the current of the judicial mind, and the principle of them arises from the very nature of a railroad. A public ferry is a franchise, and consists not merely in the building of the ferry and the furnishing of the boats, but in the running of them. The right of the public to use them is common, but the running of the ferry is a part of the franchise. The running of the ferry is a part of *itself*, and so the running of a railroad is a part of *itself*. Whoever, therefore, is found running a public railroad for public purposes, is found exercising a function of government. Rights of this kind are only lodged in the hands of others by legislative action. The Erie Railway Company is in possession of and running this Long Dock road. It is a part of their continuous line. Their use of it is not an occasional or an incidental one, but as such company it controls and manages the trains by which its business is conducted. The Long Dock road and its management are absorbed by the Erie Railway Company, save only as it may be used by trains as a public highway, as provided in the supplement to the Long Dock charter. The Erie Railway Company has come into the State of New Jersey as an operator of a public railroad, and in that mode is doing the business of a common carrier. If the Erie Railway Company has no legislative authority to exercise the prerogative power of running a railroad, can it then have any rights under our laws as a common carrier ?

Any of our citizens, by force of the common law, could use all the conveniences which a railroad affords for the purpose of traveling and transportation, and a foreign corporation, by the comity of states, could alike use them the same as a citi-

zen of another state.  And I concede that a, foreign corpora-
tion could, on our railroads, exercise the rights of a common
carrier, for the business of a common carrier exists at common
law, and any of our citizens could become such without legis-
lative aid, and use all the facilities of travel and commerce,
whether by railroad or otherwise, which are of common right.
We extend to foreign express companies the use of our own
roads to carry on a separate business of transportation, and
on the principles of comity, we would give them every gen-
eral right which our citizens have by force of the common
law   These common law rights, however, are different from
the franchises of building and operating a railroad.  The
latter are local in their very nature, and instead of being
exercised by the government, they are lodged, by legislative
action, in the hands of individuals or corporations.

There are certain franchises not necessarily local, as, for
instance, the creation of a corporation.  And a corporation,
like an individual, though belonging to another state, may
have all the common rights which our people are entitled to,
unless in some way abridged by reason of state policy.  The
right to build a turnpike and take tolls for its use, is local—
that is, it must be exercised within the jurisdiction of its
creation, and by such instrumentalities as the legislature has
provided or recognized.  A railroad, both as to its construc-
tion and running, is the same.  Franchises of this nature are
special, and must be exercised in subserviency to such hands
as the legislature has designated.  The trust is not transfer-
able.  The very nature of it, as well as obvious reasons of
state policy, require that if any part of the governmental
power is lodged in the hands of certain persons or corpora-
tions, they should be prevented from transferring it at their
option.  Hence the necessity of legislative sanction to leases
for the control of a railroad, where its franchises are to be used
by the lessees, as of their own right, and not as mere agents
of the body authorized.  A railroad corporation may perform,
outside of its territorial existence, a great many of its func-
tions, but those franchises which are purely local must be

enjoyed under legislative authority within the sovereignty of its existence. Citizens of our own state could not build and run a public railroad for public use without legislative authority, and the comity of states should not require of us to allow the citizens of other states to do what would be denied to our own. In the language of the case in 25 *Vermont*, referred to, "We should not be expected to suffer a foreign corporation to usurp the exercise of any franchises of this character." The business of a common carrier, at common law, and the exercise of the right of building and operating a railroad, may become so amalgamated as oftentimes to make it difficult to draw the line between them. A corporation may be held to the common law liability of a carrier while purely enjoying the franchise of running a road.

A corporation authorized to establish and conduct a ferry, will be held liable as a common carrier when such liability results only as an incident to the franchise.

A foreign corporation professing to use our railroads only as common carriers, may, in the modes of use, become so amalgamated with the franchises as to make it difficult to say whether such foreign corporation has usurped any of the franchises or not. A foreign railroad company using any of our roads as a carrier merely, might furnish to them material facilities for transportation, entirely consistent with the integrity of the local franchise. It is very difficult to draw the line to which the right as a carrier would extend, and beyond which it might be regarded as an invasion of the franchise. That line need not be drawn in this case, as there is no question but that the Erie Railway Company is fully in the exercise, apparently, of all the franchises necessary to operate a railroad for public use. It is well, however, to remark, that the privileges of foreign companies to our roads should be liberally regarded, and they allowed every advantage consistent with the substantial maintenance of the right of our state to control its own instrumentalities, in the performance of such governmental duties as it is deemed best to delegate to others. As, for instance, there should be a liberal comity

recognized by our courts in allowing the incidental uses in our railroads by other companies, where they connect at state lines—the incidental running of trains from one foreign road to another, where they connect—are necessities which a due regard to the business of each would require, and the same would be entirely consistent with the integrity of the franchise allowed to each company. These and other uses of our roads by foreign companies might well be allowed, without absorbing any substantial part of the franchise.

Regarding the Erie Railway Company as running the Long Dock road, and considering that their carrying business is done by reason of their possessing and operating that road, and supposing that there is no legislative authority to exercise the franchise of running a railroad, that company then would stand in this condition; it would be a foreign corporation doing a carrying business in this state by usurpation of our own state franchises. Its freights are charged for and earned in that mode. The act is an entirety. The company cannot dissociate any common law right from what must be regarded as an act antagonistic to the laws of our state. It cannot ask protection upon the principles of comity when the business for which compensation is claimed is done by illegal means. The position of our state must be this : if a foreign corporation is content to do a carrier's business, or any other business, with such means as are common to our own people, such business should receive the countenance of our laws. But if not so content, and it invades our sovereignty, and thereby conducts it business, it should accomplish nothing by its wrong. The result, then, on this point is, that if the Erie Railway Company is not operating that road by legislative authority in this state, it cannot separate any common law claim as a carrier from its violation of our law, and thereby be allowed to charge as a common law carrier merely.

The second ground under which the power of the Erie Company upon the Long Dock road may be said to exist, is as lessees of that road, and exercising the franchises of the Long Dock Company. The presumption would be, in the

absence of any right shown, that they were lessees under legislative ratification. This would arise from the nature of the rights they are exercising, and the unwillingness of the courts to believe that they were enjoying them improperly. It cannot be told from the case whether the defendants are lessees of the Long Dock Company or not, save only as their possession of the road and the nature of their operations would indicate. I assume that the Erie Railway Company legally possess whatever rights the New York and Erie Railroad Company had in and over the Long Dock road. Their precise nature, so far as derived from the Long Dock Company, is not clearly developed. If the Erie Railway Company are lessees of that road and entitled to its franchises, what are those franchises? It is said that the Long Dock Company were not authorized to be common carriers. The language of the ninth section of the act incorporating that company, (*Laws of* 1856, *p.* 69,) is not entirely clear as to whether that company could operate their railroad. They were given power to locate, construct and maintain it, and for those purposes were "invested with the same powers and privileges, and subject to the same liabilities and restrictions, as were conferred and imposed upon the New Jersey Railroad and Transportation Company, for the locating, constructing, and maintaining their railroad, by the act incorporating said company, and the supplements thereto."

In the supplement of 1858, (*Laws of* 1858, *p.* 312,) there would seem to be some recognition of the right to operate this road by the Long Dock Company. Another supplement of 1858 (*Laws of* 1858, *p.* 204,) makes it a public highway, free for the passage of locomotives with their trains, upon payment of certain tolls. Whether, by force of the word maintain, in the original charter, and by the implication of the supplement of 1858, (*Laws of* 1858, *p.* 312,) the Long Dock Company were empowered, as carriers, need not be now settled; for if they were, it must be subject to the limitations, as to rates, contained in the New Jersey Railroad charter, and those are the same ts in the original charter of the Paterson and Hud--

son River Railroad. And if the Long Dock Company are not carriers, but were merely authorized to build and maintain the railroad as a material structure and as a public highway, then, under the principle first considered, the Erie Railway Company could not exercise the prerogative right of running it without legislative permission. The supplement of 1858, (*Laws of* 1858, *p.* 204,) which declares that " the tunnel and railroad now being constructed under and through the Weehawken or Bergen hill, in the county of Hudson, shall be a public highway, and free for the passage of locomotives with their trains, or railroad carriages thereon, with passengers and property, upon payment of tolls prescribed by the tenth section of an act entitled ' An act to incorporate the Paterson and Hudson River Railroad Company,' passed January 21st, 1831," must be construed as giving permission to use the tunnel, to those only who are authorized to exercise the powers necessary for that purpose.

The third ground upon which the defendants may be empowered to run the Long Dock road is as lessees of the Paterson and Hudson road, and using the Long Dock road as a public highway, under the franchises of the Paterson and Hudson company. And this is the true ground on which the company now stand in operating the Long Dock road. The Paterson and Hudson company, by act of January 21st, 1831, (*Harr. Laws, p.* 318,) were empowered to construct a road from Paterson to Weehawken, and thence to some suitable place on the Hudson river, within fifty feet of high-water mark, with power to hold real estate at such termination, but not to approach nearer than fifty feet of high-water mark at either of the then ferries of Hoboken, Weehawken, or Jersey City. This interdiction to fifty feet of high-water mark was evidently intended to cut the company off from ferry privileges or any interference with the shore owners. The power of the company, however, substantially extended to the river. This same provision is found in the New Jersey company's charter. By a supplement of November 18th, 1831, (*Harr. Laws, p.* 365,) this company was authorized to locate and

form their road from the east side of Bergen hill, in the county of Bergen, to *the Hudson river*, upon such route as may by them be thought advisable; and by the second section it was recited as follows: "And whereas, it may be found expedient for the president and directors of the Paterson and Hudson River Railroad Company, their *successors and assigns*, to form a tunnel under the Weehawken or Bergen hill, which would add greatly to the expense of their road, and be a great public accommodation," therefore it was enacted "that if said tunnel shall be made, it shall be legal for the said president and directors of the Paterson and Hudson River Railroad Company, their *successors* and *assigns*, in addition to the tolls already allowed, to charge for passing through said tunnel for each passenger the sum of twelve and a half ($12\frac{1}{2}$) cents, and for every ton of goods, wares and merchandise the sum of ten (10) cents."

It will thus be seen that the Paterson and Hudson company had full power to construct a railroad from Paterson to the Hudson river. That company was also empowered by the charter to run the same. A tunnel through Weehawken or Bergen hill was evidently in contemplation at the formation of the company.

At first the road was constructed as far as Bergen hill, then it turned southerly and connected with the New Jersey road, under certain agreements. Its connection now is with the Long Dock road, and reaches the Hudson river through that channel.

The lease to the Union Company was executed September 9th, 1852, and under it the Union Company were "to use, employ, and put in force all the rights, powers, and chartered privileges of the Paterson and Hudson company, for the purpose of making a tunnel or otherwise passing Bergen hill, and extending and making a railroad from any point on the Paterson and Hudson road to the Hudson river, to some point opposite to the city of New York, and for receiving tolls and making and collecting, by all lawful ways, money, at the rates permitted under and by the charter of the

Paterson and Hudson company, for transferring persons, mails, and property of every description over such new or extended railroad." This lease was confirmed after its assignment to the New York and Erie Company, and again after the Erie Railway Company became possessed of it.

The Paterson and Hudson road, with the franchises of the company, is now legally in the possession of the Erie Railway Company.

The Long Dock Company, by section nine of their charter, were empowered to build a lateral or branch railroad, to intersect any other railroad authorized or constructed by law; and with a proviso that no branch railroad constructed by virtue of that section should intersect or cross any other railroad without the consent of the company to whom the same may belong. Under this provision, the Long Dock road was constructed and connected with the Paterson and Hudson road. By the supplement of March 4th, 1858, passed while the road was being constructed, the tunnel and railroad were declared to be a public highway for the passage of locomotives with their trains, &c., upon the payment of certain tolls.

The supplement of March 11th, 1858, provided that all locomotives and their trains and railroad carriages that *may or shall be authorized by law* to be placed and run upon the same, should be regulated as to time of starting, running, &c., so as not to interfere with the use and occupancy of said railroad by the Long Dock Company or the *New York and Erie Railroad Company* or their grantees or assignees. Evidently the purpose of the legislature in this legislation was to make this tunnel-road a highway for other railroads authorized to be constructed and to run over the same general route, so that such railroads, so authorized, could use it as a part of their own road on payment of the tolls provided by the supplement of March 4th, 1858. The effect of it is, that on payment of the tolls, a connecting company, so authorized, could enjoy its franchises by running over the Long Dock road the same as if such company had built it. The Long Dock road is peculiarly a railroad-highway, and intended as

a substitute for the actual construction of an extension by other roads authorized to build through the same locality.

The public had a right to demand of the Paterson and Hudson company the means of access to the Hudson river, and in the absence of a substitute, to require the complete construction of the Paterson and Hudson road. That company, instead of building a road, are now using this tunnel-road as a substitute.

The tolls provided by the Long Dock supplement are, in some sense, an equivalent for the expenditure necessary in the construction of an extension by the Paterson and Hudson company, and in lieu of such construction, this railroad-highway has been authorized.

For all purposes of transportation, the Paterson and Hudson company must be regarded as exercising their franchises over this highway the same as if they had built the road, and their freights and charges must be in accordance with the charter of that company and the laws affecting it. Any arrangement the Erie Railway Company may have with the Long Dock Company, by which the use of the road may be compensated otherwise than by tolls, cannot affect this condition. We were referred, on the argument, to an act to authorize the New York and Erie Railroad Company to purchase and hold lands, and to complete and finish the railroad of the Paterson and Hudson River Railroad Company, passed February 21st, 1856. Objection having been made to its use, as not having been offered in evidence and not being declared a public act, I have not felt at liberty to give it any force in this connection, the legislation already referred to being sufficient to establish the point before us without the aid of that act. It should not, however, be considered as clear that that act is not public. It perhaps might be regarded as but a supplement to the Paterson and Hudson charter, and if so, would be public alike with that. The status, then, of the Erie company is as follows: in going from Paterson to Jersey City, it uses the franchises of the Paterson and Ramapo road for about one-half a mile, and for the rest of the distance, the

franchises of the Paterson and Hudson company carry it to the Jersey City depot.

The rates that the defendants may charge under the special acts affecting the Paterson and Ramapo and Paterson and Hudson companies, are as follows : the Paterson and Ramapo charter allows at the rate of ten cents per ton for each mile for transportation, and the Paterson and Hudson charter at the rate of six cents per mile per ton. This latter rate is the same as in the charter of the New Jersey Railroad and Transportation Company ; so that if the Long Dock Company are carriers, and the Erie company the legal possessors of their franchises, this would regulate the charges over the Long Dock road ; but, as the case stands, the Erie company must be considered as running over the Long Dock road under the Paterson and Hudson charter and rates.

In addition to the rates in the charter of the Paterson and Hudson company, the supplement of November 18th, 1831, already stated, allowed that company to charge ten cents for every ton of goods, wares, and merchandise passing through the tunnel. It is evident that when that supplement was passed, it was expected that that company would build the tunnel. This item of ten cents had been regularly charged to the plaintiffs previous to the imposition of the $1 terminal, and paid without objection. It formed a part of the $1.06 per ton. Considering the Paterson and Hudson company, by their leases, as running through the tunnel, the same as if they had built it, the payment of the tolls being regarded as an equivalent for its construction, I think that the Erie Railway Company should be allowed to charge that ten cents, under the supplement of November 18th, 1831. The rate for transportation, then, between Paterson and Jersey City would be as follows : half a mile on the Paterson and Ramapo road, five cents ; ten cents for the tunnel ; and fifteen miles and a fraction for the Paterson and Hudson road, at six cents, making ninety-one cents, the total being $1.06. This is the legal amount per ton, without reference to general acts, and

applying the principle of *de minimis* to the fractions of distances.

We come now to the general acts affecting railroads. The defendants claim that under an act relative to freights and fares on certain railroads in this state, passed March 14th, 1856, (*Laws of* 1856, *p.* 276,) which act, by supplement of March 4th, 1858, was extended to all other railroads in the state, (*Laws of* 1858, *p.* 201,) they could charge at least five cents a hundred pounds on each of the several roads composing their line. This act is known as the Belvidere and Flemington Railroad act, and it applied to connecting railroads. The supplement having extended it so as to make it a public act, we can refer to the legislation which induced the original act, in order to give it a construction, even if such legislation is not expressly declared to be public.

The Flemington Railroad Company, by its charter, was authorized to connect with other roads. (*Laws of* 1849, *p.* 99, § 13.) The act to authorize the Belvidere Delaware Railroad Company and the Flemington Railroad and Transportation Company, out of the net earnings of said companies, to make and declare the same dividends to stockholders, passed February 16th, 1853, (*Laws of* 1853, *p.* 90,) shows that these companies were to connect their roads and run in connection, and were authorized to make dividends out of the common earnings. The second section of the act of March 14th, 1856, is as follows: "It shall be lawful for the said companies to charge five cents for the *whole distance carried* for each hundred pounds of merchandise or other species of property, other than hereinafter mentioned, whenever the present legal charges shall not amount to said sum." Regarding the Belvidere and Flemington roads as running in connection, with a common interest, the words "*whole distance*" in that section cannot, by any natural or just construction, be limited to the distance that connecting freight may be carried on each road. That act applied to a case where two roads were authorized to run in common, and the words "*whole distance carried*" were intended to mean such distance as freights might be carried

on the line so run in common, and treating the line as one road.

In extending this act to all other railroads in the state, it is not necessary, for present purposes, to decide that each independent railroad could not have the benefit of it. My own impressions are that it could. It is sufficient, however, in this case, to say that where roads do run in common, and are operated by one company as a continuous line, that the extension of this Belvidere and Flemington act will not allow that company to limit the words "*whole distance*" to each road forming a component part of the whole line. The $1.06 which the Erie company could legally charge from Paterson to Jersey City, being in excess of five cents per hundred pounds for the whole distance, the Erie company cannot be benefited by the acts and supplements in question.

The defendants also claimed the right, on the trial, to show that the merchandise transported for the plaintiffs was express matter, within the meaning of the act relative to freights and fares on railroads, approved March 11th, 1867, (*Nix. Dig.* 795*), and that thereby they could charge twice the rate for the transportation of ordinary goods under the charter of the roads operated by them, and other laws of the state; and more particularly that the whole, or some part of it, consisted of packages weighing less than one hundred pounds each, or of packages, the value of which exceeded $1 per pound. Also, that the goods transported were forwarded in passenger or special trains. They also offered to show that the merchandise transported, as to a large part thereof, consisted of small packages, the property of different owners, and for which, if the transportation had been made directly for the owners, without the intervention of the plaintiffs as expressmen, the defendants would 'be entitled to receive twelve and a half cents per package, under an act relative to freight and transit duties on railroads in this state, approved March 24th, 1852, (*Nix. Dig.* 786†), and the supplements thereto. These several claims were overruled by the court.

The plaintiffs' goods were not carried by special agreement,

---

* *Rev., p.* 914, §§ 40, 42.    † *Rev., p.* 913, §§ 29, 34.

and hence are to be governed by the rates provided by law, but the company were not obliged to charge the full rates so provided. The mode in which the charges were fixed by the company, apart from the terminal, were as follows: if the goods were what is known as light and bulky, under the supplement of March 10th, 1853, (*Nix. Dig.* 786*), and which are to be estimated by cubic feet, or an equivalent of one ton for every eighty cubic feet, the same were estimated at the time of the delivery, and taken and charged by the ton. When the right to estimate by the package existed, an equivalent weight, at the rate of $1.06 per ton, was fixed by the agents of the company at the time of delivery—that is, such weight was fixed as at $1.06 per ton would produce the same amount that the company could charge by the package. That was the general custom of the company in dealing with the plaintiffs. As to the other goods, whether of the nature of express matter or not, they were all, at the time of delivery, estimated on the basis of weight, the same being reduced to ordinary freight. The bills were all made out by weight, and if a package now and then was charged as special, there was also an estimated weight upon that. The goods were delivered at the depots of the company at Paterson and Jersey City. The agents of the company were present and estimated the weight. The goods were generally brought a short time before the train started, and estimates had to be made from the general knowledge that the company's agents, and the plaintiffs or their agents, had of the business. The weights generally were mere estimates, but that mode of doing the business was satisfactory to both parties. All the merchandise, speaking generally, was reduced to the basis of weight as ordinary freight, and this was the case with reference to that which was carried on passenger trains as well as on strictly freight trains. It should be remarked, however, that the parties did not agree on the trial as to what were passenger trains, but that question need not now be settled. This habit of estimating the goods by weight, on the basis of ordinary freight, had existed for several years between the plain-

* *Rev.*, p. 913, § 33.

tiffs and the company, and after November 10th, 1869, (the day of the first terminal charge,) it was continued in the same way. The terminal charge was always made separately, and so appears in all the bills. Between these parties in this suit alone, not the penal, the company are estopped from now adopting, as to the items involved in this case, a different mode of estimate, or from claiming to charge for more express matter than they have charged, or from claiming to re-estimate the goods on the basis of mere single packages. The company, with the consent and acquiescence of the plaintiffs, habitually, and without any pretence of a mistake, estimated these goods as stated, both as to their quality, classification, and weight, and the terminal was not imposed upon the ground that more express matter should have been charged for, or that the weight was too little, or that the charge should have been by several package. The item of five cents per ton was fixed on the basis of the tons of freight estimated, and was so charged as terminal expenses. The question in this suit is reduced merely to the rate or amount, by the hundred pounds or ton, that the company can charge on the weight as fixed by the action of the parties.

The dispute was excluisvely as to the terminal. Had a different mode of estimating the weight been claimed at the time of delivery, or any attempt had been made to charge for more single packages, or any claim been made that the whole or any larger part of the goods was express matter, on which double rates could be charged, the plaintiffs might have refused to send their goods, or at the time, brought the company to a distinct issue, by insisting on their carrying them upon such modes of estimate as the plaintiffs thought right. At the time of delivery, the means were at hand on the part of the plaintiffs to ascertain the exact nature of the goods. Now they may not be. And again, when the amount of weight was agreed on, the plaintiffs could well consent to the transportation, knowing that the only matter then in dispute, as it was clear from the course of dealing between them, was the $1 terminal, and that they might supppose they could recover

that back if they were obliged to pay it.   It must also be presumed that the compensation charged their customers by the plaintiffs, was to some extent regulated by the amount of freight they would have to pay, and also by the mode of estimating parcels.   The facts show that everything was adjusted at the time of the delivery, between the company and the plaintiffs, except the question of terminal charge.   Under these circumstances it must be held that the defendants are now estopped from opening what has already been regularly adjusted by the parties, and by which the plaintiff's conduct has been controlled.   The issue in this case is, therefore, upon the right to the terminal, as such alone.   The remaining question is whether this charge can be recovered back, by reason of the objection of its being a voluntary payment.

It is undoubtedly a general rule of law that money voluntarily paid with a full knowledge of the facts, even if for an unjust claim, and even if paid under protest simply, cannot be recovered back.   There are many cases, however, to which the rule does not apply.   The action for money had and received, speaking generally, lies to recover money which in equity and good conscience ought to be refunded.   But this expression is too general as a guide.   The ordinary cases where it is maintained are stated by Lord Mansfield in the case of *Moses* v. *McFarland*, 2 *Burr*. 1009, very concisely, as follows: "But it lies for money paid by mistake, or upon a consideration which happens to fail, or for money got through imposition, express or implied, or extortion, or oppression, or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances."   Although the decision in *Moses* v. *McFarland* is overruled, yet this statement of the Lord Chief Justice is cited approvingly in the law.   In ordinary cases between individuals, where a person has no power to enforce an unjust claim but by legal remedies, and another pays it, even under protest, he cannot recover it.   Both parties are on an equal footing.   But where they are not on an equal footing, and money is paid, not by compulsion of law, but by compulsion

of the circumstances, as where it is paid to relieve goods from illegal restraint which could not otherwise be reasonably obtained, or to compel the performance of a duty by others in order to enjoy or obtain a right, there it may be recovered back. Of this latter kind may be moneys paid under color of tolls, or charges on turnpikes or railroads. *Fearnley et al.* v. *Morley,* 5 B. & C. 25; *Parker* v. *The G. W. R. R. Co.,* 7 M. & G. 253; *Parker* v. *Bristol & Exeter R. W. Co.,* 6 Exch. 702. The principle of those cases is that money was paid involuntarily, in point of fact, and in order to induce the parties to do what they were obliged to do without requiring the payment. It was the right of the plaintiffs to have their goods carried for the legal rates, and if it was reasonably necessary for the plaintiffs to pay the unjust demand in order to enjoy that right, and they did then pay, under protest, the payment will not be considered as voluntary. In the case of *Parker* v. *The G. W. R. R. Co.,* the company refused, in terms, to carry the goods unless paid their demands. In the case of *Fearnley* v. *Morley,* the gate of a turnpike being closed, a coachman was prevented from proceeding, the coachman protesting, but paying the toll demanded. In these cases there was an express refusal, but I do not consider it necessary that the refusal should be express. It is sufficient if the person has just and reasonable ground to apprehend that unless the money is paid his goods will not be carried, or will be withheld. Where a corporation or person has the power to refuse a right to which a party is entitled, unless he complies with an unjust demand, they do not stand on an equal footing. The courts will not be illiberal in allowing a person to act upon his reasonable apprehension of such refusal, when the circumstances fairly show that unless he does submit to the illegal demand, his rights will be withheld. There are indications in the following cases to that effect in principle: *Valpy* v. *Manley,* 1 M., G. & S. 594; *Morgan* v. *Palmer,* 2 B. & C. 729; *Steele* v. *Williams,* 8 Exch. 624. I find no case directly ruling the point, but the principle seems to be this: that if, in dealing with a railroad corporation, the illegal demand is

of such a character as that a person of ordinary prudence would be justified in believing that unless he did submit to it the carriage of his goods, or their delivery when carried, would be denied, and he does submit under protest, that then it is not voluntary; and in most cases the facts should be left to the jury to say whether the payment, under the particular circumstances, was voluntary or not. In the case before us, the company had issued a general order to their agents to make the additional charge. It was peremptory, without any qualification, and the company have no right to say that it was an experiment. The local agents had no right to receive goods at less rates, or to take less in payment of carriage. The plaintiffs were doing a daily business, which could not help but be injured by interruptions. Their business was done in this way: there would be at least one freight each way a day; the bills for the down freight from Paterson and the up freight from Jersey City would be paid the next day after the carriage was accomplished and the goods generally delivered. When the two first bills were presented, after the terminal was imposed, which was about the next day after the up and down freights of November 10th, 1869, the plaintiffs refused to pay the terminal, and protested against it, but afterwards paid it, and protested against succeeding bills a number of times, and asked the cashier whether it was necessary to have this protest in writing, and he said, no; then they asked him if it was necessary to protest every time, and the cashier said it was considered a protest against all the bills the plaintiffs would have to pay. The undisputed facts of this case show that both the plaintiffs and the cashier considered that these sums were being paid under protest, and were disputed by the plaintiffs. There seems to be no doubt of the fact that the plaintiffs were unwilling to pay them, and did it without intending in any way to yield their objections. Now, the company having given direct orders to their agents to charge the terminal, without any discretion, and the plaintiffs being informed of the order to collect it, the conclusion could reasonably and naturally be drawn that the company

intended to do what they claimed. It is not a case of an in-
dividual making an unjust demand. A great corporation like
that, is operated systematically and by many agents. It is the
duty of the subordinates to follow instructions, to carry them
out, and to adopt such means as are natural and usual for
their enforcement. The plaintiffs could reasonably believe
that, unless their demand was complied with, their business,
which was of a continuous character, requiring promptness
and dispatch, would be interrupted.

Under the facts, then, of this case, the payment must be
regarded as under coercion, and the jury were so bound to
find, except as to the first two bills claimed, of the date of
November 10th, 1869; protest having been made after they
were presented and goods delivered, they may be considered
as voluntarily paid.

The plaintiffs are therefore entitled to a judgment on the
verdict, upon remitting the amount of these two bills.

BEASLEY, CHIEF JUSTICE, and Justice DEPUE concurred.