**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2622-23

ESTATE OF ISAAC HERSKO,[1]

    Plaintiff-Appellant/Cross-
    Respondent,

v.

BARRY HERSKO, BELLA
HERSKO, and CHAIM
SIMKOWITZ,

    Defendants-Respondents/
    Cross-Appellants,

and

THE ROSEVILLE
TOWER, LLC,[2]

    Defendant-Respondent.

_____

Argued December 15, 2025 – Decided January 2, 2026

---

[1] Regrettably, Isaac Hersko passed away while his appeal was pending.

[2] Defendant-respondent The Roseville Tower, LLC, is not participating in this appeal.

Before Judges Gilson, Firko, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C-000220-21.

Anthony Genovesi (Abrams Fensterman, LLP) of the New York bar, admitted pro hac vice, argued the cause for appellant/cross-respondent (Greenbaum Rowe Smith & Davis, LLP, Anthony Genovesi and Melanie Wiener (Abrams Fensterman, LLP) of the New York bar, admitted pro hac vice, attorneys; Darren C. Barreiro and Anthony Genovesi, of counsel and on the briefs; Thomas K. Murphy, III, and Melanie Wiener, on the briefs).

Harris N. Cogan (Blank Rome LLP) of the New York bar, admitted pro hac vice, argued the cause for respondents/cross-appellants Barry Hersko and Bella Hersko (Blank Rome LLP, attorneys; Jonathan M. Korn, Michael R. Darbee, Harris N. Cogan and Craig Flanders (Blank Rome LLP) of the New York bar, admitted pro hac vice, on the briefs).

Michael D. Malloy argued the cause for respondent/cross-appellant Chaim Simkowitz (Finestein & Malloy, LLC, attorneys; Michael D. Malloy and Corrine LaCroix Tighe, on the briefs).

PER CURIAM

Plaintiff Estate of Isaac Hersko (Isaac[3] or Estate) appeals from an April 15, 2024 order dismissing his claims with prejudice against defendants Barry Hersko and Bella Hersko (collectively the Herskos), The Roseville Tower, LLC (Roseville Tower), and Chaim Simkowitz following a bench trial. The Chancery Division judge dismissed all claims asserted by all parties with prejudice primarily based on the doctrine of unclean hands. Simkowitz cross-appeals from the same order that dismissed his cross-claims against the Herskos. The Herskos cross-appeal to protect their claims against Simkowitz in the event that his cross-claims are restored on appeal. We affirm.

## I.

### Factual Background

We derive the pertinent facts from the record. Isaac and Barry were brothers. They had various business relationships and owned residential properties both in New York and New Jersey. Barry worked for Isaac selling corrugated materials. Ultimately, Barry decided to start his own real estate business. He acquired several properties in New York and enrolled in a special program in New York City aimed at making his vacant apartment units available

---

[3] Parties and individuals who share a last name with other parties and individuals are referred to by their first names for ease of reference. By doing so, we intend no disrespect.

to homeless individuals. When Isaac's corrugated materials business became unsuccessful, causing him to struggle financially, Barry proposed that Isaac form an entity to lease apartments from Barry's affiliated entities and manage the apartments as an intermediate service provider. In response, Isaac created, "We All Care, Inc.," which made apartments available for homeless individuals under a New York City sponsored program. We All Care, Inc. paid a daily rate to Barry's affiliated entities for the apartments. In return, We All Care, Inc. received funding from New York City and earned the difference in profits.

On April 20, 2007, Roseville Tower, a New York limited liability company, purchased a vacant and abandoned property located at 140-148 Roseville Avenue in Newark (the Roseville property) comprised of 270 residential units for $5.825 million from Shlomo Karpen, his wife Esther Karpen, Israel Perlmutter, and his wife Esther Perlmutter. Shlomo and Israel each own a 50% membership interest in Roseville Tower. Esther Karpen and Esther Perlmutter guaranteed repayment of the first mortgage with their husbands.

Roseville Tower signed and executed a promissory note and mortgage with Isaac and Barry to acquire the Roseville property in the amount of $2.5 million at a 12% annual interest rate. In addition, Roseville Tower signed and

A-2622-23

executed a subordinate note and mortgage in the amount of $3.22 million with GIAIP, LLC, a New York limited liability company. Gloria Adler is the managing member of GIAIP, LLC. Subsequently, Roseville Tower defaulted on its mortgage with Isaac and Barry.

On January 4, 2010, Isaac and Barry entered into an agreement with Roseville Tower and its owners to resolve the default. Under the agreement, Roseville Tower agreed to make a $750,000 lump sum payment to reduce the $1.5 million principal balance and to pay Isaac and Barry's legal fees. The remaining principal balance was due on or before June 25, 2010, secured by 100% membership of Roseville Tower, assigned on a contingent basis to Barry's wife, Bella.

Shlomo paid the $750,000 lump sum payment, which reduced the principal balance to $750,000. Isaac claimed there was no evidence to prove Bella provided any consideration for the 100% membership interest other than the payment of one dollar since she had nothing to do with the existing mortgages on the Roseville property. Roseville Tower defaulted a second time and consequently, Bella became the 100% owner of Roseville Tower.

After Bella became the sole owner, Barry had discussions with Simkowitz about acquiring 50% of Bella's interest in Roseville Tower. Eventually, an

agreement was reached. On October 28, 2010, Bella executed a document assigning 50% of her interest in Roseville Tower to Simkowitz. In addition, by way of an assignment of mortgage, Isaac and Barry assigned 50% of the first mortgage interest to Simkowitz. At the closing, Simkowitz wrote two checks: one for $350,000 to Isaac, and the other for $150,000 to Barry.

Simkowitz wanted to satisfy the subordinate mortgage and commence development. According to Barry, a plan was devised whereby he and Isaac would use their leverage on the first mortgage to buy out the subordinate mortgage at a significant discount. Isaac claimed he never participated in this "sham" foreclosure because he had forfeited his interest in the first mortgage, there was no communication about the foreclosure action that involved him, and he had nothing to gain from the transaction. At trial, Barry and Simkowitz testified that Isaac was included in the discussions. Simkowitz recommended retaining the Feinsilver Law Group (FLG) to represent Barry and Isaac in a foreclosure action against Roseville Tower and GIAIP, LLC. Isaac and Barry signed the retainer agreement to retain FLG on the mortgage foreclosure matter. Simkowitz paid FLG's retainer.

6

On December 13, 2010, FLG filed a complaint in foreclosure of a mortgage[4] (the 2010 foreclosure action) on behalf of Isaac and Barry against Roseville Tower, GIAIP, LLC, and Israel, seeking to foreclose the mortgage, and alleging defendants owed $3.4 million on the note. Shortly thereafter, Isaac and Barry negotiated to purchase the subordinate mortgage. On May 2, 2011, GIAIP, LLC—through Adler—assigned the subordinate mortgage to Isaac and Barry, LLC, for somewhere in the $220,000 to $300,000 range. Barry was the sole owner of Isaac & Barry, LLC. On May 10, 2011, Simkowitz notified FLG the foreclosure matter was settled, and the complaint was dismissed.

Barry claimed Simkowitz managed Roseville Tower's affairs through Northside Towers, LLC (Northside). Simkowitz maintained a ledger of capital inflows used to pay for Roseville Tower's expenses. The majority of Bella's payment contributions were derived from Isaac's entity, We All Care, Inc. Barry alleged he would advise Isaac to have We All Care, Inc. pay Northside for Roseville Tower's expenses. These payments reduced the amount We All Care, Inc. owed to Barry's affiliated entities for property rentals in the homeless shelter

---

[4] Barry Hersko and Isaac Hersko v. The Roseville Tower, LLC, et al., Docket No. ESX-F-059134-10 (Ch. Div. Dec. 13, 2010). The complaint was filed on December 13, 2010, and dismissed by the court for lack of prosecution on December 12, 2012.

A-2622-23

business while satisfying Bella's capital contributions to Roseville Tower. Isaac alleged that these actions supported his claim for money had and received because Roseville Tower and its owners received a benefit from him and retention of this benefit would be inequitable.

On May 18, 2016, Roseville Park, LLC purchased a parking lot adjacent to the Roseville property. Barry and Simkowitz each held a 50% membership interest in Roseville Park, LLC. In July 2021, Simkowitz attempted to enter an agreement to assign mortgages and LLC interest (the 2021 agreement) with Bella and Barry to acquire the remaining 50% membership interest in Roseville Tower and Roseville Park, LLC. Simkowitz claimed the parties scheduled a closing in October 2021, but a run-down title search revealed that Isaac had filed a notice of lis pendens on the Roseville property, and the closing did not go forward.

The Litigation

On October 1, 2021, Isaac filed a complaint in the Law Division[5] against the Herskos and Roseville Tower seeking a declaratory judgment, imposition of a constructive trust, alleging conversion, money had and received, and for an accounting from these defendants with respect to the finances and affairs of the

---

[5] Docket No. ESX-L-7389-21.

A-2622-23

Roseville property and the amounts Isaac was entitled to receive from Abraham Weisel's escrow account. The complaint alleged Weisel acted as Barry's escrow agent but had represented both Isaac and Barry. The complaint alleged Isaac and Barry provided a loan for over $3 million to the former owners of the Roseville property, the borrowers defaulted and agreed to permit the brothers to take title in satisfaction of the private loan.

Isaac claimed he and Barry agreed to form separate and distinct entities to purchase and hold title to the property and the Herskos were listed as the "sole shareholder." Isaac alleged he and Barry were "equal partners" in their business dealings related to Roseville Tower. In 2017, the brothers memorialized their longstanding partnership in a written partnership agreement. According to Isaac, he had a falling out with Barry upon learning he was collecting "rents and other monies" far exceeding Isaac's withdrawals. Isaac claimed that Barry withdrew $25,000,000 more than him from "their shared monies."

The Herskos filed an answer denying the allegations in Isaac's complaint and seeking to discharge the lis pendens. Simkowitz moved to intervene in the action. On November 19, 2021, the Law Division judge granted Simkowitz's motion to intervene and permitted him to file an answer and counterclaim. The Law Division judge also transferred the matter to the Chancery Division.

9

In his answer, Simkowitz admitted that Bella is a member of Roseville Tower but also asserted he is a member of Roseville Park, LLC. In his counterclaim, Simkowitz alleged on October 28, 2010, he acquired a 50% membership interest in Roseville Tower from Bella, and that he paid "good and valuable consideration" for his interest. Simkowitz averred how at the time of his acquisition of the Roseville Tower interest, the Herskos represented to him that Bella was the "sole member" of Roseville Tower, possessed "all right, title[,] and interest[,]" and had "authority" to transfer the interest he acquired.

According to Simkowitz, he had "no knowledge, actual or constructive," that Isaac had any interest in either Roseville Tower or the real property owned by the entity. Simkowitz alleged Roseville Tower is encumbered by two mortgages, one in the original face amount of $2,500,000 held by the Herskos, and another in the amount of $3,220,000, held by Isaac & Barry, LLC. Simkowitz alleged Roseville Tower is further encumbered by a first assignment of rents/leases held by Isaac and Barry. Simkowitz alleged he "intends," after acquiring both mortgages and the assignment of rents/leases, "to discharge them of record."

Simkowitz further alleged in his counterclaim that he and Barry formed Roseville Park, LLC to purchase the property adjacent to Roseville Tower's

10

A-2622-23

property and owned shares equally. Simkowitz claimed that since acquiring the Roseville Tower interest in 2010, he "has directed day-to-day operations" and "funded the carrying costs" in an amount "higher than" his 50% interest. Simkowitz sought a declaratory judgment declaring he presently holds a 50% membership interest in Roseville Tower, that Isaac does not have a membership interest in Roseville Tower, discharge of the lis pendens, and for an order discharging both mortgages and the assignment of rents/leases, establishing an equitable lien for specific performance of the agreement with 50% of the sales proceeds being deposited into court or held in escrow pending resolution of Isaac's claims, compensatory damages, punitive damages, and counsel fees.

In his cross-claim against the Herskos, Simkowitz demanded specific performance of the 2021 agreement by delivering to him the "instruments contemplated by the [2021] agreement[,]" that the deposit monies be deposited into court or otherwise held in escrow for an equitable lien to secure his interest, and counsel fees.

Isaac filed an answer to Simkowitz's counterclaim denying the allegations and seeking a judgment of no cause of action.

Simkowitz filed a motion to rescind the 2021 agreement between himself, the Herskos, and Roseville Tower. The motion was unopposed. On October 11,

2023, the judge rendered an oral decision granting Simkowitz's motion and entered an order that day. The order provided the 2021 agreement is "hereby rescinded and deemed null and void[,]" and the assignment documents referenced in the 2021 agreement were also declared "null and void." The order directed the Herskos's attorney to return Simkowitz's $540,007.60 deposit held in escrow to him.

On October 23, 2023, Simkowitz filed amended cross-claims and alleged an additional count under the New Jersey Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1 to -94. Simkowitz maintained the Herskos failed to pay their share of Roseville Tower's expenses since 2020, which led to capital account shortfalls. Simkowitz sought to recoup the shortfalls and dissolve the LLCs because the deadlock was preventing the LLCs from functioning.

Following a period of discovery, the Herskos, Roseville Tower, and Simkowitz filed partial motions for summary judgment. Simkowitz sought a ruling declaring that he and Bella were Roseville Tower's co-owners. The judge denied the motions. Isaac filed a motion for leave to file and serve a first amended complaint, which did not add new causes of action but alleged facts he claimed were uncovered during discovery. Simkowitz filed a second motion for

12

summary judgment, which was later withdrawn. In response, Isaac filed a cross-motion for leave to file and serve a second amended complaint, which the judge converted to a motion in limine and heard on the first day of trial, January 23, 2024.

## The Trial

On the first day of trial, Isaac orally withdrew his claims for any ownership interest in Roseville Tower, Roseville Park, LLC, the subordinate mortgage, and ownership of funds held in Barry's lawyer's escrow account. Isaac's attorney withdrew these claims after "assessing the deposition testimony . . . [and] the documentary proof[,]" and determining Isaac could not prove his claims. The judge permitted the withdrawal but did not rule on whether dismissal of the claims was with or without prejudice. Isaac pursued two remaining claims at trial: (1) for a 50% interest in the first mortgage; and (2) for money had and received to recoup funds that We All Care, Inc. allegedly contributed to Roseville Tower's operations. Isaac's proposed second amended complaint was never filed.

Trial was held on four non-consecutive days. At the onset of trial, the judge struck Isaac's jury demand. Simkowitz, Barry, and Bella testified at trial on Isaac's case. Isaac did not testify because of health reasons. Simkowitz

testified regarding his acquisition of a 50% membership interest in Roseville Tower and the blank assignee in the document that assigned the 50% membership interest to him. Simkowitz claimed he did not know why the assignee designation was blank but surmised he could "fill [it] in whenever [he] want[s]." Simkowitz explained he had discussions with Isaac and Barry about "squeezing down the [subordinate] lender" and investing in the Roseville property. According to Simkowitz, Barry and Isaac signed the assignment of his 50% membership interest on the first mortgage.

On cross-examination, Simkowitz testified about the 2010 foreclosure action and his relationship with FLG. Simkowitz further testified about his payments for the Roseville Tower and first mortgage assignments.

Barry testified about Isaac's relinquishment of the first mortgage and clarified that there was no document to reflect this. Regarding the 2010 foreclosure action, Barry testified he never saw the foreclosure complaint until he met with his attorney. Barry admitted the 2010 foreclosure action contained a false allegation. Barry stated he never received emails from FLG about the 2010 foreclosure action and disputed the signatures on the foreclosure pleadings and demand notices.

14

When questioned about purchasing the subordinate mortgage at a lower rate, Barry testified the plan was to always get it "cheaper." Barry confirmed the mortgage payments from Isaac's entity, We All Care, Inc., represent the payments Isaac owed to him. With regard to the assignment document with the blank assignee's name, Barry testified it was implemented at Simkowitz's request.

Bella testified she owned a 50% membership interest on the Roseville property and made the mortgage payments. Bella stated she was unaware of the 2010 foreclosure action and that Barry handled it. Bella also testified about selling and assigning a 50% membership interest to Simkowitz.

At the close of Isaac's case, the Herskos orally moved for involuntary dismissal of certain claims pursuant to Rule 4:37-2(b). Isaac's counsel moved for a directed verdict and argued the judge should apply the doctrine of unclean hands to the Herskos based on their participation in the 2010 foreclosure action. Isaac's counsel also argued that all of Barry's and Simkowitz's testimony should be discredited based on the maxim, "falsus in uno, falsus in omnibus." The judge reserved decision on the motions and instructed counsel to submit briefs on the application of the unclean hands doctrine to Herskos's motion.

On February 14, 2024, the next scheduled trial date, the judge dismissed all of the parties' claims, counterclaims, and cross-claims before defendants presented their cases. Citing <u>Rule</u> 4:37-2(b),[6] the judge determined Isaac had no proof to support his claim for money had and received. The judge reasoned Isaac proffered no evidence that he "paid it for an interest in [Roseville Tower]" or "established a superior right to those funds."

Next, the judge addressed Isaac's motion for a directed verdict based on the unclean hands doctrine. The judge dismissed all of the counterclaims and cross-claims based on the doctrine of unclean hands noting the record "is replete with admissions of fraudulent filings, unethical and otherwise questionable conduct, which[,] without any doubt, includes the filing of a sham foreclosure complaint, hiding the true ownership interest in [Roseville Tower]." The judge found the "sham foreclosure complaint"—the 2010 foreclosure action—was filed to "deceive and defraud the subordinate mortgagee" and cause her to sell the subordinate mortgage "for pennies on the dollar."

---

[6] <u>Rule</u> 4:37-2(b) allows the movant to "move for a dismissal of the action or of any claim on the ground that upon the facts and upon the law . . . plaintiff has shown no right to relief" after completing "the presentation of . . . evidence on all matters."

A-2622-23

The judge highlighted that Simkowitz "fully admitted his role in the scheme[,]" and since Isaac and Barry were named as parties in the 2010 foreclosure complaint, they "cannot believabl[y] feign ignorance thereof." The judge stressed:

> Isaac was, at best, . . . complicit in the bogus assignment of the mortgage and the fake foreclosure. He was a party to both and there is no evidence that would negate his participation. . . . Simkowitz and Barry . . . were at the core of the bad conduct.

> As to . . . Bella . . . , the [c]ourt has no reason to discount her testimony nor the supporting evidence that she was merely a nominal participant in the entirety of all of the relevant transactions. However, she was put forward as the party in interest and legally shall be treated as such.

> . . . .

> The self-dealing of all the parties may not something on its own would cause necessarily concern or the application of this doctrine but here, it provides further evidence of a systematic approach by the parties to cutting corners and utilizing the very documents at the core of the legal system: mortgages, notes, [LLCs] and other government sponsored programs, in a manner that goes beyond the intent of those instruments, which is namely to provide a system that can be relied on by those likely to rely on such documents.

> Those likely to come into contact with these parties whose proclivity to skate upon the outskirts and use these constructs of legitimate processes to serve what are less than honorable mechanisms to further

17

their own questionable schemes, including using the [c]ourts to promote a false narrative and outright lie about the status of financial arrangements and misrepresent mortgages, loans, [LLC] ownerships, all to further their own purposes.

However, the judge reserved decision as to dismissal of the claims with or without prejudice until she received all of the parties' submissions. The judge recalled Simkowitz back to the stand for the limited purpose of authenticating the FLG retainer agreement and establishing his possession of it. The judge moved the FLG retainer agreement into evidence. The judge then gave the parties until February 23, 2024 to file their submissions to the court.

On April 15, 2024, the judge issued an order granting Isaac's motion for voluntary dismissal of certain claims under Rule 4:37-1, and dismissing his remaining claims with prejudice. In addition, the judge granted the Herskos's motion to dismiss Isaac's claim for money had and received under Rule 4:37-2, with prejudice. The judge also dismissed the parties' remaining claims based on unclean hands—including the Hersko's cross-claims and Simkowitz's counterclaim and cross-claims—with prejudice.

In her comprehensive statement of reasons annexed to the order, the judge determined that Isaac's voluntarily withdrawn counts were deemed to be "with prejudice." The judge reasoned Isaac filed three complaints, each alleging five

18

causes of action as stated, and he never "minimized" or withdrew any of the counts until the first day of trial. The judge emphasized Isaac continued to claim an interest in Roseville Tower and the Roseville property, as evidenced by his filing of a lis pendens.

Further, the judge found Isaac "sought to expand his purported interests" by later claiming an interest in the first and second mortgages, and Isaac & Barry, LLC. The judge highlighted Isaac also filed several litigation actions, which are pending in the Supreme Court of the State of New York, Kings County, related to his allegation that he and Barry were "partners in several real estate investments." The judge noted two of those actions "involve similar (if not the exact same) allegations and causes of action" as the instant matter.

Citing our decision in Shulas v. Estabrook, 385 N.J. Super. 91, 96-97 (App. Div. 2006), the judge considered the impact of Isaac's motion to voluntarily dismiss claims on defendants at this "late stage of litigation[.]" The judge found Isaac sought to amend his complaint twice, which resulted in the filing of amended answers and crossclaims by defendants. The judge recounted the extensive motion practice in the case, including discovery and summary judgment motions, the five depositions taken, and the "voluminous pre-trial submissions" prepared by all parties.

The judge explained Isaac "acknowledged that the counts were being dismissed for lack of proof." The judge observed that after Isaac became "incapacitated," and was unable to participate in the litigation, he was still represented by counsel, who could have attempted to "temporarily stay the matter or minimize the volume of discovery." In addition, the judge pointed out Isaac's children had a durable power-of-attorney but no appearance by any family member was made on his behalf "during discovery or trial itself." The judge underscored Isaac's counsel "was warned from the bench" that no "special treatment or any undue advantage" would be extended in continuing the trial without his participation. Based on the parties' "nefarious conduct in this matter," the judge did not "countenance" an award of counsel fees to any party relative to Isaac's voluntarily withdrawn counts.

Regarding the judge's previous dismissal of Isaac's "money had and received" claim from the bench, the judge ruled that dismissal was "with prejudice," as a "matter of completeness." The judge dismissed all remaining claims between the parties with prejudice based on the unclean hands doctrine. The judge relied on her February 14, 2024 oral decision and stressed the equitable doctrine of unclean hands "is a direct result of the conduct of the parties." The judge reiterated her finding that a "sham foreclosure complaint"

20

had been filed in 2010, which included "knowingly fraudulent allegations related directly to the mortgages put before this court by all parties. . . ."

The judge recognized dismissal with prejudice is a "drastic remedy" and should be used "sparingly[,]" citing Zaccardi v. Becker, 88 N.J. 245, 253 (1982). However, the judge determined that here, "the acts of the litigants are directly at issue." The judge found the "blameworthiness" of the litigants as discussed weighed "heavily in favor of a with prejudice dismissal."

The judge noted there "has been no attempt by any party" to minimize the impact on the second mortgagee. The judge specifically rejected Isaac's attempt to "carve out his conduct from the other partie[s]" finding "the parties acted in pari delicto[.]" The judge highlighted examples in the record of Isaac's involvement in the foreclosure on the first mortgage and "related plans":

- Isaac was a signatory to the January 4, 2010 agreement.

- Simkowitz testified that Isaac participated in the plan to foreclose the first mortgage.

- Isaac was a signatory to the October 2010 assignment of mortgage.

- Isaac is identified as a "client" on the retainer agreement with FLG, and he "ostensibly" signed it.

21

- Isaac was a party to the 2010 foreclosure complaint.

- In his proposed second amended complaint, Isaac alleged that he was an owner of Isaac and Barry, LLC, which held the second mortgage. After the judge "expressed skepticism of the foreclosure procedure" did Isaac seek to "distance himself" from ownership of the second mortgage. Isaac continued to seek a benefit by maintaining an ownership interest in the alleged "sham" in the form of an interest in the first mortgage.

This appeal followed.

Before us, Isaac argues:

(1) the factual record does not support a finding of unclean hands on his part;

(2) the facts clearly support a finding he has a 50% interest in the first mortgage;

(3) involuntary dismissal of his money had and received claim pursuant to Rule 4:37 was incorrect; and

(4) the claims he voluntarily dismissed prior to trial should be dismissed without prejudice.

The Herskos counter that the judge did not abuse her discretion in dismissing Isaac's claims with prejudice. In their cross-appeal, the Herskos seek a reciprocal ruling as to their accounting claims against Simkowitz, who asserted competing cross-claims for an accounting relating to Barry and Bella's interests in Roseville Tower and Roseville Park, LLC.

22

Simkowitz cross-appeals contending the judge erred:

(1) in dismissing a claim she incorrectly identified as having been made by Roseville Tower;

(2) in determining that the standard for the application of the unclean hands doctrine had been met and using that as a basis to dismiss all of his claims;

(3) in dismissing his claims with prejudice against Barry and Bella for insufficient capital contributions to Roseville Park LLC and for the dissolution of that entity;

(4) in abruptly ending the trial immediately after Isaac testified, denying Simkowitz his right to prosecute his claims for capital contributions, for dissolution of the LLCs, and for discharge of the mortgages on the Roseville property; and

(5) by applying an omnibus application of the unclean hands doctrine and assuming arguendo it was justified, the judge properly refused to except therefrom Isaac's first mortgage claim. Simkowitz also contends the judge could not have made a finding as to whether Isaac has a 50% interest in the first mortgage.

II.

We review a decision on a motion for involuntary dismissal de novo applying the same standard that governs the trial courts. ADS Assocs. Grp., Inc. v. Oritani Sav. Bank, 219 N.J. 496, 511 (2014). Rule 4:37-2(b) provides that after a plaintiff has rested their case, the defendant may move to dismiss "on the ground that upon the facts and upon the law the plaintiff has shown no right to

23

relief. . . . [S]uch motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor."

"If the court, 'accepting as true all the evidence which supports the position of the party defending against the motion and according [them] the benefit of all inferences which can reasonably and legitimately be deduced therefrom,' finds that 'reasonable minds could differ,' then 'the motion must be denied.'" ADS Assocs., 219 N.J. at 510-11 (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)). "[T]he judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969). "Ordinarily, the dismissal motion should be denied if the plaintiff's case rests upon the credibility of a witness." Pressler & Verniero, Current N.J. Court Rules, cmt. 15 on R. 4:37-2 (citing Ferdinand v. Agric. Ins. Co. of Watertown, N.Y., 22 N.J. 482, 494 (1956)).

A.

Isaac argues the judge erred in dismissing his claims against the Herskos and Simkowitz under the doctrine of unclean hands because the record lacked clear and convincing evidence that he had unclean hands when this litigation

24

commenced, citing <u>Kars 4 Kids, Inc. v. Am. Can!</u>, 98 F. 4th 436, 449-50 (3d. Cir. 2024).  The Herskos counter that the judge did not err because the evidence supported her conclusion Isaac had unclean hands going into the case.

In his cross-appeal, Simkowitz maintains the judge erred in dismissing his cross-claims against the Herskos because:  (1) the <u>Hageman</u>[7] case relied on by the judge is not binding authority and is distinguishable from this case; (2) the judge misapplied the doctrine of unclean hands under <u>Untermann</u>[8]; and (3) the judge failed to consider that the conduct must have been directed at the party defending against the claim, citing <u>City of Paterson v. Schneider</u>, 31 N.J. Super. 598, 607 (App. Div. 1954).

Isaac counters that the judge did not err in dismissing Simkowitz's cross-claims under the doctrine of unclean hands because Barry and Simkowitz engaged in wrongful and criminal conduct.  The Herskos contend the judge did

---

[7]  <u>Hageman v. 28 Glen Park Assoc., L.L.C.</u>, 402 N.J. Super. 43 (Ch. Div. 2008). <u>Hageman</u> is a published Chancery Division opinion.  Once an opinion is published, "[t]he precedential reach of a published opinion depends on the place in the judicial hierarchy of the court issuing the opinion.  In general, opinions of higher courts bind all lower courts but opinions of co-equal courts do not bind each other."  Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 3.1 on <u>R.</u> 1:36-3 (2026).

[8]  <u>Untermann v. Untermann</u>, 19 N.J. 507 (1955).

not err in dismissing all claims because the record supports a finding of unclean hands.

In order to recover in equity, a party "must be with clean hands." Heuer v. Heuer, 152 N.J. 226, 238 (1998). The unclean hands doctrine provides, "a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit." Faustin v. Lewis, 85 N.J. 507, 511 (1981).

However, there are limits to the doctrine's application. Heuer, 152 N.J. at 238. For example, the unclean hands doctrine "should not be used as punishment[,] but to further the advancement of right and justice." Pellitteri v. Pellitteri, 266 N.J. Super. 56, 65 (App. Div. 1993) (citing Heritage Bank, N.A. v. Ruh, 191 N.J. Super. 53, 71-72 (Ch. Div. 1983)). The doctrine:

> does not repel all sinners from courts of equity, nor does it apply to every unconscientious act or inequitable conduct on the part of the complainants. The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act of the defendant which the complaining party states as his ground or cause of action; but it must be evil practice or wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought.
>
> [Heuer, 152 N.J. at 238 (quoting Neubeck v. Neubeck, 94 N.J. Eq. 167, 170 (E. & A. 1922)).]

Applying the doctrine of unclean hands is within the court's discretion. <u>Borough of Princeton v. Bd. of Chosen Freeholders of Mercer</u>, 169 N.J. 135, 158 (2001).

"While '[u]sually applied to . . . plaintiff[s], this maxim means that a court of equity will refuse relief to [any] party who has acted in a manner contrary to the principles of equity.'" <u>Chrisomalis v. Chrisomalis</u>, 260 N.J. Super. 50, 54 (App. Div. 1992) (quoting <u>Johnson v. Johnson</u>, 212 N.J. Super. 368, 384 (Ch. Div. 1986)). "One well known treatise has described the effect of appl[ying] . . . the doctrine as follows":

> [w]henever a party, who, as an actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principles, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.
>
> [<u>Hageman</u>, 402 N.J. Super. at 48-49 (quoting 2 Pomeroy, <u>Equity Jurisprudence</u> § 397 (5th ed. 1941)).]

Here, the judge properly relied on <u>Hageman</u> to assert her inherent equitable power to sanction the perpetration of a fraud. <u>See also</u> <u>Triffin v. Automatic Data Processing, Inc.</u>, 394 N.J. Super. 237, 253 (App. Div. 2007).

In <u>Untermann</u>, our Supreme Court offered guidance on applying the doctrine of unclean hands:

It is the effect of the inequitable conduct on the total transaction which is determinative whether the maxim shall or shall not be applied. Facades of the problem should not be examined piecemeal. Where fraudulent conduct vitiates in important particulars the situation in respect to which judicial redress is sought, a court should not hesitate to apply the maxim.

[19 N.J. at 518.]

We conclude the judge's application of the doctrine of unclean hands as to all parties was supported by substantial credible evidence in the record. The judge provided detailed reasons in her oral opinion and statement of reasons in applying the doctrine. Moreover, in her well-reasoned opinion, the judge determined these parties "knowingly introduced fraudulent evidence to a court in a sworn complaint." The judge stressed there had been "no attempt by any party" to minimize the impact of the fraudulent conduct upon the subordinate mortgagee, who gave up her interest in the mortgage "at a fraction of its potential value."

We discern no grounds for disturbing the trial court's finding that Isaac's conduct should not be "carve[d] out" from the other parties' conduct and to impose a "lesser sanction" on him. The record supports the judge's conclusion that the parties acted in pari delicto, and we discern no error.

28

For similar reasons, we reject Simkowitz's argument that the judge erred in applying the doctrine of unclean hands in dismissing his cross-claims against the Herskos. In her oral opinion, the judge observed Simkowitz was at "the core of the bad conduct." Contrary to Simkowitz's contention, the record shows he "fully admitted his role in the scheme," which included filing the sham 2010 foreclosure complaint, hiding the true ownership interest in Roseville Tower, to "deceive and defraud the subordinate mortgagee" to sell the subordinate mortgage "for pennies on the dollar." The judge noted Simkowitz's actions "infected this very subject matter" in the litigation. The self-dealing between the parties to further their own "questionable schemes" based on "less than honorable mechanisms" and "outright lie[s]" about financial arrangements and documents warranted application of the doctrine of unclean hands and dismissal of all claims with prejudice.

B.

Next, we address Isaac's argument that the facts support a finding he has a 50% interest in the first mortgage. Isaac challenges the judge's ruling because he contends it is "undisputed" there have been no other assignments or satisfactions of the first mortgage, and he and Barry are both listed as mortgage holders. Isaac argues there were no other agreements in the record that

29

extinguished his ownership interest in the first mortgage. Isaac asserts Barry's and Simkowitz's contradicting testimony should be disregarded on this issue.

The Herskos counter the judge properly dismissed Isaac's claim under the doctrine of unclean hands. Simkowitz seeks a remand on this issue. Again, we are unpersuaded.

The judge did not reach this issue because her unclean hands ruling against Isaac barred him from pursuing this claim. We decline to make findings of fact and conclusions of law as to whether Isaac owns 50% of the first mortgage as he suggests we do. R. 2:10-5.[9] Therefore, we conclude Isaac's argument is unavailing.

## C.

Isaac also argues the judge erred in granting the Herskos's motion to involuntarily dismiss his claim for money had and received[10] because he

---

[9] See Rivera v. Union Cnty. Prosecutor's Off., 250 N.J. 124, 146 (2022) (quoting R. 2:10-5) ("Appellate courts can 'exercise . . . original jurisdiction as is necessary to the complete determination of any matter on review' . . . [however,] [t]hat power should be invoked 'sparingly'").

[10] Isaac's merits brief references the prima facie elements for a claim of unjust enrichment, not money had and received. "[U]njust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." Goldsmith v. Camden Cnty. Surrogate's Off., 408 N.J. Super. 376, 382 (App. Div. 2009).

established a prima facie case in support of this claim. The Herskos counter the judge properly dismissed Isaac's money had and received claim.

"An action for money had and received is an equitable action governed by equitable principles (and) may in general be maintained whenever one has money in his [or her] hands belonging to another which in equity and good conscience he [or she] ought to pay over to that other." Township of Franklin v. Jones, 86 N.J.L. 224, 225 (E. & A. 1914). "It has been held that money voluntarily paid with full knowledge of the facts, even if for an unjust claim, or if paid under protest[,] cannot be recovered." Slocum v. Borough of Belmar, 238 N.J. Super. 179, 193 (Law Div. 1989) (citing McGregor v. Erie Ry. Co., 35 N.J.L. 89, 112 (Sup. Ct. 1871)). Recovery is limited in the following circumstances: "money paid by mistake, or upon a consideration which happens to fail, or for money got through imposition, express or implied, or extortion, or oppression, or an undue advantage taken of . . . plaintiff's situation . . . [c]ontrary to laws made for the protection of persons under those circumstances." Ibid. (quoting McGregor, 35 N.J.L. at 112).

Isaac contends it is undisputed that: (1) there were expenses that Roseville Tower and its owners needed to pay along with required capital contributions; (2) Isaac made those contributions through We All Care, Inc.; and (3) Isaac was

31

We All Care Inc.'s sole owner, controlled its accounts, and contributed $643,794.10 to pay for Roseville Tower's expenses because he believed he had a membership interest in it. According to Isaac, Roseville Tower received an inequitable benefit from him by accepting his contributing payments.

The Herskos point out that Isaac has not established a prima facie claim for money had and received because he failed to present sufficient evidence to show he personally made contributions to Roseville Tower. The Herskos further contend there was no evidence to support Isaac's claim that the payments from We All Care, Inc. to Northside Towers were his capital contributions.

Applying Rule 4:37-2(b) principles, we agree with the judge that Isaac failed to establish a case for money had and received. The unrefuted evidence reveals We All Care, Inc. made payments to Northside Towers to pay for Roseville Tower's expenses. As the judge aptly noted:

> The [c]ourt notes it is unchallenged that whether the entity is called We All Care, Inc., or We Care, Inc., this was an entity that was controlled exclusively by Isaac and was formed to receive funds from a New York City Program that paid rent to landlords for homeless and potentially other at-risk tenants. . . .
>
> It is also undisputed that Isaac opened a bank account with checks for the entity that appear[s] as We Care, Inc., as opposed to the actual incorporated name of We All Care, Inc. . . .

32

> There was zero evidence presented that beyond the error in the name, there was any other distinction between the two entities. The check stubs marked into evidence . . . have both names appearing on them without any explanation for that discrepancy. . . .

Thus, we conclude Isaac's claim for money had and received was properly dismissed.

## III.

### A.

In his cross-appeal, Simkowitz argues the judge erred in dismissing a claim incorrectly identified as having been made by Roseville Tower. Simkowitz contends the order contains misstatements of fact as to Roseville Tower, it was entered contrary to the court rules, and could potentially lead to an inequitable result. He asks this court to modify certain paragraphs in the judge's April 15, 2024 order to delete references to Tower, LLC (i.e. Roseville Towers) because it implies his counsel represents Roseville Tower, which is not the case.

Any such error falls within the jurisdiction of the Chancery Division. Under Rule 1:13-1,

> [c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight and omission may at any time be corrected by the court on its own initiative or on the motion of any party, and

33

on such notice and terms as the court directs, notwithstanding the pendency of an appeal.

"This rule makes clear that notwithstanding the pendency of an appeal, the trial court has the power to correct clerical errors in the record made before it." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 1:13-1 (2026). "This [Rule] is inapplicable to clerical errors other than those appearing in the judgment or order itself." Ibid. Therefore, Simkowitz can file a Rule 1:13-1 motion in the Chancery Division to correct any clerical errors.

B.

Simkowitz also argues in his cross-appeal that the judge erred in dismissing, with prejudice, his crossclaims for insufficient capital contributions made to Roseville Tower, and non-party Roseville Park, LLC, for dissolution of those entities and for discharge of the mortgages on Roseville Tower based on unclean hands. Simkowitz contends the dismissal with prejudice is unsupported and not explained on the record, maintaining the Roseville Park, LLC cross-claims were unrelated to the December 2010 foreclosure action and were not "tainted" by the parties' conduct regarding the mortgages.

In response, the Herskos argue Simkowitz's cross-claims were properly dismissed with prejudice because there is a nexus between his cross-claims and

the 2010 foreclosure action. The Herskos assert the doctrine of unclean hands does not allow a claimant to parse out related claims or conduct.

We reject Simkowitz's arguments. As previously stated, we conclude the judge was well within her discretion in dismissing all of the parties' claims with prejudice under the doctrine of unclean hands. Specifically, the judge found Simkowitz and the Herskos had unclean hands stemming from the 2010 foreclosure action and consequently, their conduct was directly related to the competing cross-claims.

We hold there is no basis to reverse and allow Simkowitz an opportunity to present an affirmative case for an accounting. Thus, the Herskos's cross-appeal seeking similar relief is moot.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2622-23